**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF GEORGIA**
**BRUNSWICK DIVISION**

| | |
|---|---|
| Elevance Health, Inc., Anthem Insurance Companies, Inc., Blue Cross of California, Wellpoint Health Plans, Inc., Wellpoint Insurance Company, and Wellpoint Iowa, Inc. | Civil Action No. _____ |
| Plaintiffs, | |
| v. | |
| DEPARTMENT OF HEALTH AND HUMAN SERVICES<br>Hubert H. Humphrey Building<br>200 Independence Avenue, S.W.<br>Washington, D.C. 20201<br><br>CENTERS FOR MEDICARE & MEDICAID SERVICES<br>7500 Security Boulevard<br>Baltimore, MD 21244 | |
| Defendants. | |

## COMPLAINT

Plaintiffs Elevance Health, Inc., f/k/a Anthem Inc. ("Elevance Health"), along with its affiliated entities Anthem Insurance Companies, Inc., Blue Cross of California, Wellpoint Health Plans, Inc., Wellpoint Insurance Company, and Wellpoint Iowa, Inc. (collectively with Elevance Health, "Plaintiffs"), by and through their undersigned counsel, hereby file this Complaint for relief against Defendants the United States Department of Health and Human Services ("HHS") and the Centers for Medicare & Medicaid Services ("CMS") (collectively, "Defendants"). Plaintiffs allege as follows:

**INTRODUCTION**

1.      This action is brought under the Administrative Procedure Act to set aside Defendants' final agency action based on, among other reasons, CMS's failure to follow the "great...black letter administrative law" principle "that like cases must receive like treatment." This case arises in the context of the Star Ratings program—one of the most important aspects of the Medicare Advantage ("MA") program—through which CMS annually "scores" contracts entered into between the agency and Medicare Advantage Organizations ("MAOs") on a five-star scale to convey a measure of quality to consumers of Medicare insurance coverage. *See* 42 C.F.R. §§ 422.162(b), 422.166(h)(1)(ii), 423.182(b), 423.186(h)(1)(ii). To arrive at a Star Rating, CMS evaluates all MA contracts using what should be the same extensive slate of measures and evaluation methodology addressing quality, compliance, and other metrics.

2.      Since 2010, the Star Ratings program has had enormous financial implications for MAOs because the Star Rating for the contracts determines the amount of funds CMS will pay to MAOs in the form of rebate retentions and a Quality Bonus Payment ("QBP") for qualifying plans, paid throughout the year after the Star Rating is given (*e.g.*, 2026 Star Ratings determine 2027 QBPs). The payments resulting from Star Ratings, including QBPs, are critical because the dollars can be used to, among other things, increase member benefits, reduce premiums, and offer quality improvement programs to members, thereby offering a richer benefit design and more attractive product in the MA competitive marketplace.

3.      CMS published its "2026 Star Ratings" for each contract in October 2025. By this lawsuit, Elevance seeks to set aside those 2026 Star Ratings for contracts H0544, H0907, H1423, H4036, and H8849 because CMS has only just recently granted extraordinary relief to a peer MAO

on terms that, upon information and belief, CMS has not extended to any other MAO, including Elevance.

4.      Specifically, a court from this District recently held in the matter captioned *Clover Insurance Co. v. U.S. Dep't of Health & Human Servs.*, No. 2:25-CV-142, 2026 WL 1483515 (S.D. Ga. May 27, 2026), on reconsideration, No. 2:25-CV-142, 2026 WL 1510382 (S.D. Ga. May 29, 2026), that twenty measures used in CMS's 2026 Star Ratings calculation were unlawful, and ordered CMS to recalculate the 2026 Star Rating for the plaintiff in that case, Clover Insurance Company ("Clover"), by excluding those twenty measures. Upon information and belief, CMS did just that. In a June 10, 2026, Securities and Exchange Commission ("SEC") public filing, the plaintiff (Clover) confirmed that CMS had recalculated its 2026 Star Rating consistent with the court's decision.

5.      The *Clover* court identified two bases for rejecting the twenty measures targeted by the plaintiff: ten were deemed unlawful because they were based on data sources that the Medicare Act does not authorize CMS to consider; and another ten were deemed procedurally improper because they were required to be, but were not, adopted through notice-and-comment rulemaking. Those same twenty measures factored into Elevance's 2026 Star Ratings. Had CMS extended to Elevance the benefit of the *Clover* court's holding—as it did for Clover—Elevance would realize an approximately $115 million increase in its 2027 QBP, additional resources that could be used to improve benefits, reduce premiums, and fund quality improvement programs for its members.

6.      The harm to Elevance from CMS's different treatment of similarly situated MAOs extends beyond the financial. CMS publicizes Star Ratings through its My Plan Finder tool, directly affecting beneficiary enrollment decisions; contracts rated 4.0 Stars or above can offer enhanced benefits funded by higher QBPs, which in turn determines competitive positioning in

the MA marketplace. By giving Clover a recalculated, more favorable Star Rating while refusing to extend that same recalculation to Elevance, CMS has directly disadvantaged Elevance in markets where the two MAOs compete for the same Medicare beneficiaries.

7. There is no legal basis for this different treatment. The twenty measures invalidated by the *Clover* court factored into the Star Ratings of every other MAO, including Elevance's. If those measures were legally defective as applied to Clover—as the court held—they were equally defective as applied to Elevance. CMS cannot rationally maintain that the same methodology is simultaneously legally defective (for Clover, necessitating recalculation) and legally sound (for all other MAOs, justifying no recalculation), absent some specific factual distinction between Clover and those other MAOs. No material distinction exists.

8. Nor can CMS take refuge in the *Clover* court's order: when CMS recalculated Clover's Star Rating but then did something else for other MAOs, including Elevance, CMS made independent methodological choices that were not dictated by the court. The decision to do one thing for Clover and something else for other MAOs is subject to full review under the APA. Applying one Star Rating methodology to Clover and a materially different methodology to a direct competitor is arbitrary and capricious.

9. Before filing this lawsuit, Elevance made a written request to CMS leadership to adjust its 2026 Star Ratings on terms identical to those made available to Clover. CMS rejected that request in a written response. By this lawsuit, Elevance seeks an order compelling CMS to give Elevance the identical relief it has already given to Clover: a recalculation of its 2026 Star Ratings by excluding the same twenty measures that the *Clover* court held were legally or procedurally unlawful.

## JURISDICTION, VENUE, AND EXHAUSTION

10. This Court has jurisdiction over this case pursuant to 28 U.S.C. § 1331 because this action arises under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*, and raises questions under the Medicare statute, 42 U.S.C. § 1395 *et seq.*

11. Venue is proper in this Court under 28 U.S.C. § 1391(e) because this is an action against United States agencies and a substantial part of the events or omissions giving rise to the claim occurred in this District. Among other things, H4036 is Elevance's largest national contract by enrollment, serving approximately 365,000 members nationally. Georgia has the highest membership by state with over 81,000 members (22%) residing in Georgia. A substantial number of the H4036 members residing in Georgia reside in this District, including many members in the Brunswick Division. In addition, H4036 has 11 group health plan clients in Georgia, with over 100,000 members affiliated with those Georgia group clients.

12. CMS published Elevance's 2026 Star Ratings on October 9, 2025. The publication of the Star Ratings is a final agency action, and it was published to the over twelve thousand members residing in this District.

13. Further, CMS's rejection on June 26 of Elevance's request for CMS to extend to Plaintiffs the same relief CMS extended to Clover was also final agency action.

14. There is no administrative process available to Elevance to seek reconsideration of CMS's actions and failure to act.

15. Elevance has standing because it offers Medicare Advantage-Prescription Drug ("MA-PD") plans and Defendants both incorrectly calculated the 2026 Star Ratings for those contracts and then arbitrarily refused to give equal treatment to Plaintiffs as CMS provided to Clover. The 2026 Star Ratings published by CMS resulted in lower ratings for these contracts than

they would have received had CMS not exceeded its statutory authority and failed to observe procedures required by law in adopting the twenty Star Ratings measures deemed unlawful by the *Clover* court.

16.     Elevance's improperly calculated Star Ratings will result in substantial economic injury to Elevance, to the tune of more than $115 million over the course of 2027.

## **PARTIES**

17.     Elevance is an Indiana corporation with a principal place of business in Indianapolis, Indiana.

18.     Elevance provides a full spectrum of healthcare plans and services to millions of members, many of whom are beneficiaries of the federal Medicare program. Elevance, through its affiliates and subsidiaries, has entered into multiple contracts with CMS to provide coverage to Medicare beneficiaries under Medicare Parts C and D, including the following:

a.     Contract H4036, which was entered into with CMS by Anthem Insurance Companies, Inc., has a membership of 365,764 and serves enrollees in Georgia, Ohio, Wisconsin, and Kentucky. Elevance Health is the designated parent organization under the MA program for this contract. This contract's 2026 Star Rating was 4.0.

b.     Contract H0544, which was entered into with CMS by Blue Cross of California, has a membership of 50,087 and serves enrollees in California. Elevance Health is the designated parent organization under the MA program for this contract. This contract's 2026 Star Rating was 3.0.

c.     Contract H0907, which was entered into with CMS by Wellpoint Iowa, Inc., has a membership of 4,275 and serves enrollees in Iowa. Elevance Health is the designated parent organization under the MA program for this contract. This contract's 2026 Star Rating was 3.0.

d.      Contract H1423, which was entered into with CMS by Wellpoint Health Plans, Inc., has a membership of 3,886 and serves enrollees in Arizona. Elevance Health is the designated parent organization under the MA program for this contract. This contract's 2026 Star Rating was 3.0.

e.      Contract H8849, which was entered into with CMS by Wellpoint Insurance Company, has a membership of 54,306 and serves enrollees in Texas. Elevance Health is the designated parent organization under the MA program for this contract. This contract's 2026 Star Rating was 3.5.

19.     Defendant HHS is a department within the Executive Branch of the United States government that is responsible for the Medicare program. Its headquarters are located at 200 Independence Ave., S.W., Washington, D.C. 20201. HHS has delegated its authority to administer the Medicare program to CMS. *See* 66 Fed. Reg. 35437-03 (July 5, 2001).

20.     Defendant CMS is a federal agency within HHS that is primarily responsible for administering the Medicare program. *See id.* Its headquarters are located at 7500 Security Blvd., Baltimore, MD 21244.

## FACTUAL ALLEGATIONS

## I.      The Medicare Advantage Program

21.     Medicare is a federal program that provides health insurance benefits for Americans aged 65 years and older and certain disabled persons. *See* 42 U.S.C. § 1395 *et seq.*

22.     Medicare is comprised of four parts that cover various aspects of health care for its beneficiaries. Medicare Part A covers inpatient hospital stays, skilled nursing facilities, hospice care, and home health care. Medicare Part B covers outpatient care, doctor visits, preventative services, home health care, and durable medical equipment. *See* 42 U.S.C. §§ 1395c through 1395i-6 (Part A); 42 U.S.C. §§ 1395j through 1395w-6 (Part B). Under Medicare Parts A and B—

together referred to as "traditional" or "original" Medicare—the federal government itself acts as the insurer and directly pays providers for services rendered to enrolled beneficiaries.

23. Alternatively, a beneficiary may choose to enroll in Medicare Part C, known since 2003 as Medicare Advantage, rather than traditional Medicare. Congress created Medicare Part C through the Balanced Budget Act in 1997. *See* 42 U.S.C. § 1395w-21 *et seq.* The Medicare Advantage program allows private health insurers to contract with CMS to provide Medicare-covered benefits to enrolled beneficiaries, thereby transferring the financial risk of providing Medicare benefits from the federal government to privately run MAOs in exchange for a per-member, per-month payment. *See* 42 U.S.C. § 1395w-23. The per-member, per-month payment amount paid must be at least as high as traditional Medicare spending per enrollee.

24. MAOs must provide members with at least the same level of benefits offered by traditional Medicare. This option has proven to be a highly popular one among Medicare beneficiaries.

25. MAOs combine coverage from both Parts A and B and are often offered with prescription drug coverage under Medicare Part D, the fourth and final part of Medicare, introduced in 2003 and effective in 2006 as part of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 ("MMA"), Pub. L. No. 108-173, 117 Stat. 2066 (2003) to provide prescription drug benefits. *See* 42 U.S.C. § 1395 *et seq.*

26. In addition to other programmatic changes, through the MMA, Congress established an annual bidding process. *See id.* § 1395w-23(a)(1)(B). Through this process, CMS establishes yearly benchmark rates aimed to represent CMS's cost to provide traditional Medicare benefits to an average enrollee in a county. *See id.*

27.     Every year, MAOs must submit a bid (by the first Monday in June) that represents the estimated cost for the MAO to provide basic Medicare benefits to members for the coming year, including administrative overhead and profit. *See id.* § 1395w-24. If a bid is lower than CMS's county-level benchmark, CMS returns a portion of the savings as a "rebate," which the MAO can use to fund additional benefits or reduce premiums (or both). *See id.* § 1395w-23(a)(1)(E).

## II.     Star Ratings and their financial impact on MAOs

### A.     Background on Medicare Star Ratings

28.     The Medicare "Star Ratings" program is CMS's primary tool aimed at measuring and publicizing the quality of care provided by MAOs—and the primary mechanism through which Congress created financial incentives for MAOs to compete on quality. Even before today's Star Ratings system, MAOs were required to maintain "an ongoing quality assurance program" for the healthcare services provided to their members. Pub. L. No. 105-33, § 4001, 111 Stat. 251, 291 (1997) (codified at 42 U.S.C. § 1395w-22(e)(1)).

29.     Before 2003, Congress expressly granted CMS the authority to choose the "quality and outcomes measures" that the Secretary "determine[d] to be appropriate" as part of plans' quality assurance programs. 42 U.S.C. § 1395w-22(e)(1), (e)(2)(A)(xii) (1997). That broad discretion caused uncertainty and confusion, as CMS proposed various quality measures and practice standards at will.

30.     In 2003, Congress ended this uncertainty by writing CMS's quality measures into law. *See* MMA, Pub. L. No. 108-173, § 109, 117 Stat. 2066 (2003). These amendments restricted CMS to requiring quality-measure data that were "the types of data that were collected by the Secretary as of November 1, 2003," permitting deviation from those data types only after

submitting a report to Congress. 42 U.S.C. § 1395w-22(e)(3)(B). Congress simultaneously renamed quality assurance programs "quality improvement program." *Id.* § 1395w-22(e)(1).

31.     CMS acknowledged in 2004 that it was constrained under § 1395w-22(e), and that going forward it would rely only on its existing, pre-2003 measurement systems of clinical quality, health outcomes, and beneficiary satisfaction: the Healthcare Effectiveness Data and Information Set ("HEDIS"), Health Outcomes Survey ("HOS"), and Consumer Assessment of Healthcare Providers and Systems ("CAHPS"). *See* 69 Fed. Reg. 46,866, 46,886 (Aug. 3, 2004) ("We interpret section 1852(e)(3)(B)(i) of the Act to mean that we can continue to require MA coordinated care plans to collect, analyze, and report their performance by using the measurement systems that are currently required, such as HEDIS, Health Outcomes of Seniors (HOS), and CAHPS, as appropriate for the type of plan.").

32.     CMS established its Star Ratings system in 2007. In 2010, the Patient Protection and Affordable Care Act ("ACA"), Pub. L. No. 111-148, 124 Stat. 119 (2010), introduced the Quality Bonus Payment program and adopted the Star Ratings system to implement it. Congress identified § 1395w-22(e) as the exclusive source of data for quality rating calculations, omitting the clause previously granting the Secretary discretion to consider other measures. *See* 42 U.S.C. § 1395w-23(o)(4)(A). Congress designed this framework to ensure that beneficiaries have access to meaningful, standardized quality information when selecting plans—and to create significant financial incentives for MAOs to compete on quality.

33.     On May 27, 2026, the U.S. District Court for the Southern District of Georgia held that "the plain text of 42 U.S.C. § 1395w-23(o)(4)(A), when read alongside surrounding statutory provisions in the Medicare Act, supports the conclusion that CMS may *only* base its quality rating

calculations on measures using data collected under Section 1395w-22(e)." *Clover Ins. Co.*, 2026 WL 1483515, at \*14. The *Clover* decision is discussed at greater length in Section III.B below.

### B.    Medicare Star Rating calculations

34.    A Star Rating synthesizes a range of quality data about each contract into a summary rating of 1 to 5 Stars, including half-Stars. CMS calculates a contract's overall Star Rating through a multi-step process. First, CMS scores the contract on each applicable "measure"—a discrete performance criterion measuring some aspect of quality—on a scale of 1 to 5. Second, CMS applies a predetermined weight to each measure score. Third, CMS aggregates the weighted measure scores into a single overall Star Rating.

35.    Because the overall Star Rating is a weighted average, a contract's score on any individual measure—particularly a high-weight measure—can tip the overall rating above or below a critical threshold. The 4.0-Star threshold is the most consequential: contracts rated at or above 4.0 Stars qualify for a QBP; contracts rated below do not. The financial stakes of that threshold are discussed in Section II.C below.

36.    CMS publishes its Star Rating methodology, including the list of applicable measures, their weights, and the cut-points used to assign measure-level scores, in annual sub-regulatory guidance documents called "Technical Notes." CMS updates these Technical Notes—and the measures they describe—outside of notice-and-comment rulemaking.

37.    CMS's authority over that methodology is strictly bounded by 42 U.S.C. § 1395w-23(o)(4)(A) and § 1395hh(a)(2). Section 1395w-23(o)(4)(A) requires that the Star Rating system be "based on the data collected under section 1395w-22(e)"—meaning HEDIS, HOS, and CAHPS, the three measurement systems CMS itself identified as its permissible data sources.

38.    CMS may not incorporate measures based on data from other sources. Nor may CMS establish or materially change a measure specification that constitutes a "substantive legal

standard governing the scope of benefits, the payment for services, or the eligibility of individuals, entities, or organizations to furnish or receive services or benefits" without promulgating a regulation through notice-and-comment rulemaking. 42 U.S.C. § 1395hh(a)(2).

### C.     Rebate retentions and the Quality Bonus Payment

39.     Under the MA program, MAOs submit bids to CMS, and when an MAO's bid falls below the applicable benchmark, the difference generates a "rebate" that CMS returns to the MAO for use in providing enhanced supplemental benefits, reducing cost-sharing, or lowering member premiums. The portion of the rebate that an MAO is permitted to retain—and deploy for these purposes—is directly tied to its Star Rating, creating a financial incentive for plans to invest in quality performance. Plans rated below 3.5 stars (including unrated or new plans) retain 50% of the rebate amount, while plans achieving a rating of at least 3.5 but below 4.5 stars retain 65%. Plans earning the highest tier of 4.5 stars or above retain the maximum 70% of the rebate, reflecting CMS's policy goal of rewarding higher-quality plans with greater financial flexibility. This tiered structure means that a plan's Star Rating has significant downstream implications not only for its QBPs but also for its ability to fund richer benefit designs and remain competitive in the marketplace.

40.     Under 42 U.S.C. § 1395w-23(o), CMS pays a QBP to MAOs whose contracts achieve a Star Rating of 4.0 or above. The QBP takes the form of an increased benchmark—the maximum per-member amount CMS will pay—which in turn allows the MAO to offer enhanced supplemental benefits and return excess payments to enrollees as rebates.

41.     The financial ramifications of a sub-4.0 Star Rating and a 4.0-or-above Star Rating are substantial. For a large MAO like Elevance, the loss of QBP eligibility and the associated reduction in rebates can translate into the loss of hundreds of millions of dollars annually across its contracts.

42.    The Star Rating that determines QBP eligibility for a given payment year is calculated by CMS in the preceding year and published in October. CMS published the 2026 Star Ratings on October 9, 2025.

43.    Those ratings—and the unlawful measures which contributed to their calculation—directly determined Elevance's QBP eligibility and are the subject of this action.

## III.    Elevance's 2026 Star Ratings

### A.    Publication of Star Ratings in October 2025

44.    On October 9, 2025, CMS published the 2026 Star Ratings for each of the contracts at issue.

45.    CMS assigned overall 2026 Star Ratings of 4 Stars to H4036, 3.5 Stars to H8849, 3 Stars to H0544, 3 Stars to H0907, and 3 Stars to H1423. Many of those ratings fell below the 4.0-Star threshold that determines QBP eligibility under 42 U.S.C. § 1395w-23(o). In addition, these contracts qualified for rebate percentages based upon their assigned Star Rating.

46.    CMS also published Elevance's measure-level Star Ratings on its website, making both the overall and measure-specific ratings visible to Medicare beneficiaries, brokers, and the public through the My Plan Finder tool.

47.    Plaintiffs do not challenge the facial accuracy of CMS's math; rather, Plaintiffs challenge the lawfulness of certain measures that factored into that math.

### B.    The *Clover* decision

48.    On November 7, 2025, Clover Insurance Company filed suit in the Southern District of Georgia challenging its 2026 Star Rating on grounds that certain measures were unlawfully adopted. Clover asserted a number of legal theories in support of why its 2026 Star Rating should be recalculated.

13

49. The court agreed with respect to twenty measures on which CMS relied in calculating the 2026 Star Ratings. In an order issued May 27, 2026, the court held that the Medicare statute (42 U.S.C. § 1395w-23(o)(4)(A)) prohibits CMS from incorporating Star Rating measures based on data collected outside § 1395w-22(e). *Clover Ins. Co.*, 2026 WL 1483515, at \*14. The court further held that CMS's use of measures established or materially changed without notice-and-comment rulemaking violated 42 U.S.C. § 1395hh(a)(2). *Id.* at \*25.

50. The following chart shows the measures deemed unlawful under the two theories adopted by the *Clover* court:

| | |
|---|---|
| **Category 1:** Measures Based on Non-§ 1395w-22(e) Data Sources | • **C32** (Reviewing Appeals Decisions);<br>• **C33** (Call Center – Foreign Language Interpreter and TTY Availability);<br>• **D01** (Call Center – Foreign Language Interpreter and TTY Availability);<br>• **D05** (Rating of a Drug Plan);<br>• **D06** (Getting Needed Prescription Drugs);<br>• **D08** (Medication Adherence for Diabetes Medications);<br>• **D09** (Medication Adherence for Hypertension (RAS antagonists));<br>• **D10** (Medication Adherence for Cholesterol (Statins));<br>• **D11** (MTM Program Completion Rate for CMR);<br>• **D12** (Statin Use in Persons with Diabetes) |
| **Category 2:** Measures Established or Materially Changed Without Notice-and-Comment Rulemaking | • **C03** (Annual Flu Vaccine);<br>• **C04** (Improving or Maintaining Physical Health);<br>• **C05** (Improving or Maintaining Mental Health);<br>• **C15** (Reducing the Risk of Falling);<br>• **C16** (Improving Bladder Control);<br>• **C22** (Getting Needed Care);<br>• **C23** (Getting Appointments and Care Quickly);<br>• **C24** (Customer Service).<br>• **C25** (Rating of Health Care Quality)<br>• **C27** (Care Coordination) |

14

51.    The court vacated Clover's 2026 Star Rating and ordered CMS to recalculate it consistent with the court's holdings (*i.e.*, without regard to the twenty measures deemed unlawful).

52.    As of the filing of this complaint, CMS has not appealed the decision in *Clover*. In fact, it appears the agency mooted its opportunity for appeal by granting Clover complete relief: in a June 10, 2026, public filing with the SEC, Clover reported that CMS had recalculated Clover's 2026 Star Rating consistent with the court's order.

### C.    The effect of *Clover* on Elevance's MA contracts

53.    Exhibit A to this Complaint is a chart that shows how the 2026 Star Ratings for each of the contracts at issue would change if those ratings were recalculated by removing the same twenty measures the *Clover* court found unlawful and which, upon information and belief, CMS excluded in recalculating Clover's 2026 Star Rating. As Exhibit A demonstrates, absent the twenty unlawful measures, Elevance's contracts at issue would have received overall 2026 Star Ratings of 3.5, 4, or 4.5 Stars rather than 3, 3.5, or 4 Stars.

54.    The financial impact of this change would be enormous, amounting to approximately $115 million in QBPs over the course of 2027. This is money that Elevance could put toward additional benefits, lower premiums, and additional quality improvement activities for its members.

### D.    CMS's response to *Clover*

55.    Unfortunately, CMS did not apply the *Clover* outcome to all affected contracts. Based on information and belief, CMS only applied the outcome of that decision to Clover itself.

56.    This stands in sharp contrast to CMS's own established practice. When two federal courts invalidated aspects of CMS's 2024 Star Rating methodology, CMS extended the benefit of those rulings to every MAO in the industry—not just the prevailing plaintiffs. In a June 13, 2024, HPMS memorandum, CMS stated that "[i]n light of recent court decisions[,] CMS is recalculating

the 2024 Star Ratings for 2025 [QBP] purposes" and "[a]ssigned all contracts the recalculated 2024 overall and/or summary Star Ratings[.]" *See SCAN Health Plan v. Dep't of Health & Hum. Servs.*, Civ. A. No. 23-3910 (D.D.C. June 3, 2024); *Elevance Health, Inc. v. Becerra*, Civ. A. No. 23-3902 (D.D.C. June 7, 2024). CMS's refusal to follow that same course of conduct here is arbitrary, capricious, and inconsistent with its own established practice.

57.     For everyone else, CMS applied a different methodology to recalculate Plaintiffs' (and the rest of the MA industry) contracts. In a Health Plan Management System ("HPMS") memorandum issued on June 17, 2026, entitled "Update to 2027 Quality Bonus Payment Determinations" (the "June 17 HPMS memorandum"), CMS announced a recalculation—not of 2026 Star Ratings, as the *Clover* court ordered for Clover, but of 2027 QBP ratings. And rather than applying the *Clover* court's specific holdings to remove the same twenty measures from the calculation, CMS developed an entirely novel methodology.

58.     Specifically, CMS removed all Part D measures wholesale, along with six Part C measures that were not among the measures the *Clover* court addressed—Special Needs Plan Care Management, Complaints about the Health Plan, Members Choosing to Leave the Plan, Plan Makes Timely Decisions about Appeals, Reviewing Appeals Decisions, and Call Center - Foreign Language Interpreter and TTY Availability.

59.     Under CMS's formulation, a contract received the recalculated QBP rating only if it was higher than the previously assigned rating, and CMS held harmless any contract whose recalculation would have produced a lower rating. Contracts with QBP ratings that improved were offered the extraordinary opportunity for a time-limited window to resubmit their 2027 bids.

60.     With respect to 2027 QBPs, the logic of the June 17 HPMS memorandum does not materially improve Elevance's position from its original 2026 Star Ratings. That is because, among

16

other things, in removing *additional* measures from the recalculation of 2027 QBPs (*i.e.*, measures that were not addressed in the *Clover* decision), CMS removed measures on which Elevance scored well.

61.     In short, as it concerns Elevance, the June 17 HPMS memorandum was a half measure that does not offer terms to Elevance on par with the terms CMS extended to Clover. And the harm to Elevance is not merely that it is deprived of substantial additional QBPs over the course of 2027. Competitor MAOs that do benefit from the June 17 HPMS memorandum will see increased 2027 QBPs that they can factor into their bids for the 2027 Medicare Advantage plan year in the form of lower premiums or additional benefits. Those MAOs will gain a competitive market advantage.

62.     By letter dated June 22, 2026—the deadline imposed by the June 17 HPMS memorandum for MAOs to notify CMS of their bid resubmission intentions—Elevance informed CMS that the June 17 HPMS memorandum did not improve Elevance's ratings and specifically requested that CMS instead afford Elevance the same treatment it extended to Clover as a result of the *Clover* decision. Elevance raised three specific objections to CMS's actions: first, CMS had not treated similarly situated MAOs consistently in its response to the *Clover* decision; second, CMS had created an entirely new calculation methodology—removing only some of the measures addressed in the Clover decision, retaining other measures that the court had invalidated, and removing additional measures that the Clover decision did not address at all—without providing any explanation or justification for how it selected the measures it chose to remove; and third, that the June 17 HPMS memorandum's restriction on bid resubmissions disadvantaged Elevance relative to competitor MAOs that would see increased QBPs they could factor into their 2027 bids in the form of lower premiums or additional benefits. Elevance asked CMS to allow it (and any

17

other similarly situated MAO) the option not merely to choose between (a) the original 2026 Star Ratings and the 2027 QBP that would flow from that rating and (b) a recalculated 2027 QBP on the terms set out in the June 17 HPMS memorandum, but also (c) terms identical to what CMS gave to Clover. This would be the only way for CMS to give every affected MAO the benefit of the doubt.

63.     By written response to Elevance on June 26, 2026, CMS refused to grant the requested relief, prompting Elevance to file this lawsuit.

## CLAIMS FOR RELIEF

### COUNT I: ARBITRARY AND CAPRICIOUS AGENCY ACTION
### (5 U.S.C. § 706(2)(A))

64.     Plaintiffs incorporate paragraphs 1-63 as if set forth fully herein.

65.     Under 5 U.S.C. § 706(2)(A), the Court must hold unlawful and set aside agency action that is arbitrary or capricious, *inter alia*.

66.     "[T]he great principle that like cases must receive like treatment is ... black letter administrative law." *Grayscale Invs., LLC v. SEC*, 82 F.4th 1239, 1245 (D.C. Cir. 2023) (citation omitted). An agency's failure to abide by this principle is arbitrary and capricious.

67.     In the weeks following the *Clover* decision, CMS gave another MAO (Clover) that is similarly situated to Elevance in material respects so far as the Star Ratings program is concerned different, preferred treatment. This is not something the APA allows CMS to do.

68.     Because CMS arbitrarily and capriciously treated a similarly situated MAO better than it treated Elevance, the Court should set aside the unlawful 2026 Star Ratings for the contracts set forth in Exhibit A and order CMS to recalculate those Star Ratings without regard to the same twenty measures removed from the recalculation of Clover's 2026 Star Rating.

## COUNT II: AGENCY ACTION NOT IN ACCORDANCE WITH LAW, IN VIOLATION OF STATUTORY RIGHT, IN EXCESS OF STATUTORY AUTHORITY
### (5 U.S.C. § 706(2)(A), (C))

69. Plaintiffs incorporate paragraphs 1-63 as if set forth fully herein.

70. Congress limited the data on which CMS's Star Ratings may be based to data for which an MAO provides for the collection, analysis, or reporting as part of its quality improvement program. 42 U.S.C. § 1395w-23(o)(4)(A) (requiring that Star Ratings to be based on "data collected under section 1395w-22(e) of this title").

71. CMS based the 2026 Star Ratings for the contracts set forth in Exhibit A on measures that are based on data not collected under § 1395w-22(e).

72. These measures include: C32, C33, D01, D05, D06, D08, D09, D10, D11, and D12. Each measure is calculated using data generated outside the HEDIS, HOS, and CAHPS programs established under § 1395w-22(e)—including IRE contractor data, covert CMS call-monitoring data, Part D PDE administrative claims data, Part D plan-reported MTM data, and Part D CAHPS data administered under Part D authority rather than § 1395w-22(e).

73. Because CMS calculated the 2026 Star Ratings for the contracts set forth in Exhibit A based on data not collected under § 1395w-22(e), the Court should set aside the unlawful 2026 Star Ratings for those contracts and order CMS to recalculate those Star Ratings without regard to these ten measures.

## COUNT III: AGENCY ACTION TAKEN WITHOUT OBSERVANCE OF PROCEDURE REQUIRED BY LAW
### (5 U.S.C. § 706(2)(D); 42 C.F.R. § 422.164)

74. Plaintiffs incorporate paragraphs 1-63 as if set forth fully herein.

75. Pursuant to 5 U.S.C. § 706(2)(D), an agency may not act in a way that is without observance of procedure required by law.

76.     Congress has mandated that CMS must engage in notice-and-comment rulemaking and codify by regulation any "rule, requirement, or other statement of policy" that "establishes or changes a substantive legal standard governing the scope of benefits, the payment for services, or the eligibility of individuals, entities, or organizations to furnish or receive services or benefits under [Medicare]." *Azar v. Allina Health Servs.*, 587 U.S. 566, 570 (2019) (quoting 42 U.S.C. § 1395hh(a)(2)).

77.     And by its own regulation, CMS is required to adopt new quality measures through notice-and-comment rulemaking. *See* 42 C.F.R. § 422.164(c)(2) ("In advance of the measurement period, CMS will announce potential new measures and solicit feedback through the process described for changes in and adoption of payment and risk adjustment policies in section 1853(b) of the Act and then subsequently will propose and finalize new measures through rulemaking.").

78.     CMS did not engage in the required notice-and-comment rulemaking and codify "by regulation" the following measures applied to Elevance in calculating its 2026 Star Ratings: C03, C04, C05, C15, C16, C22, C23, C24, C25, and C27. Each of these measures establishes a substantive legal standard governing Elevance's QBP eligibility—and therefore governing "the payment for services" within the meaning of 42 U.S.C. § 1395hh(a)(2)—yet none was promulgated by regulation.

79.     Because CMS calculated the 2026 Star Ratings for the contracts set forth in Exhibit A based on measures that were adopted without observance of procedure required by law (*i.e.*, notice and comment), the Court should set aside the unlawful 2026 Star Ratings for those contracts and order CMS to recalculate those Star Ratings without regard to these ten measures.

20

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully ask the Court to issue a judgment in their favor and:

1.      Declare that in failing to give Plaintiffs the same benefit as it gave a similarly situated MAO in recalculating its 2026 Star Rating, CMS acted in an arbitrary and capricious manner;

2.      Declare that CMS's inclusion of measures C03, C04, C05, C15, C16, C22, C23, C24, C25, C27, C32, C33, D01, D05, D06, D08, D09, D10, D11, and D12 in calculating the 2026 Star Ratings for the contracts set forth in Exhibit A was arbitrary and capricious because CMS excluded those measures from the recalculation of a similarly situated MAO's 2026 Star Rating but refused to grant Elevance's demand to give it equal treatment;

3.      Declare that CMS's inclusion of measures C32, C33, D01, D05, D06, D08, D09, D10, D11, and D12 in calculating the 2026 Star Ratings for the contracts set forth in Exhibit A exceeded CMS's statutory authority because those measures were not drawn from data authorized by 42 U.S.C. § 1395w-23(o)(4)(A);

4.      Declare that CMS's inclusion of measures C03, C04, C05, C15, C16, C22, C23, C24, C25, and C27 in calculating the 2026 Star Ratings for the contracts set forth in Exhibit A was without observance of procedure required by law because CMS failed to adopt those measures pursuant to public notice and comment, as required by 42 U.S.C. § 1395hh(a)(2) and 42 C.F.R. § 422.164;

5.      Vacate the 2026 Star Ratings of the contracts set forth in Exhibit A and remand to CMS with instructions to recalculate each contract at issue's overall 2026 Star Rating excluding the twenty unlawful measures identified in this Complaint;

21

22

6.     Order CMS to determine all QBPs and rebates consistent with the recalculated Star Ratings;

7.     Order CMS to allow Plaintiffs to revise any already submitted MA bid(s) consistent with this Court's order and the recalculated Star Ratings, QBPs, and rebates; and

8.     Award Plaintiffs any other relief the Court may deem just and proper, including costs and fees, as permitted by law.

[*Signature Page Follows*]

Dated:  July 1, 2026

*/s/ Benjamin H. Brewto*n
Benjamin H. Brewton
Georgia Bar No. 002530
bbrewton@balch.com
Jena C. Lombard
Georgia Bar No. 213734
jlombard@balch.com
**Balch & Bingham LLP**
801 Broad Street, Suite 800
Augusta, Georgia 30901
Telephone: (706) 842-3711
Facsimile: (866) 258-8984

James L. Hollis
Georgia Bar No. 930998
jhollis@balch.com
**Balch & Bingham, LLP**
30 Ivan Allen Jr. Blvd. NW, Suite 700
Atlanta, Georgia 30308
Telephone: (404) 962-3585
Facsimile: (866) 332-8969

Daniel W. Wolff (*pro hac vice* forthcoming)
DWolff@crowell.com
D.C. Bar No. 486733
**Crowell & Moring LLP**
600 Fifth Street, N.W.
Washington, DC 20001
Telephone: (202) 624-2621

Steven D. Hamilton (*pro hac vice* forthcoming)
StevenHamilton@crowell.com
Illinois Bar No. 6289663
**Crowell & Moring LLP**
300 N. LaSalle Drive, Suite 2500
Chicago, IL 60654
Telephone: (312) 379-7615

*Counsel for Plaintiffs*